CV12 2661

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

C.B., by his parents J.B. and L.B.,

          Plaintiffs

-against-

The New York City Department of Education

          Defendant.
------------------------------------------------------X

COMPLAINT
_____ Civ _____

BLOCK, J.

BLOOM, M.J.

SUMMONS ISSUED

      Plaintiff C.B., by his parents J.B. and L.B., by and through the undersigned attorneys, as and for their Complaint, allege and state the following:

## NATURE OF ACTION

1.      This action is brought pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §1401 et seq. [hereinafter IDEIA] in order to seek  (a) a *de novo* review and reversal of the State Review Officer's Decision dated February 27, 2012[1] and reinstatement of the Impartial Hearing Officer's ("IHO")  December 20, 2011 Findings of Fact and Decision[2] following an independent review and consideration of the underlying administrative record and any "additional evidence" that may be appropriate for this Court to consider; (b) a determination by reason of a

---

[1]     State Review Officer Decision attached hereto as Ex. A.

[2]     Findings and Decision of Impartial Hearing Officer attached hereto as  Ex. B.

compelling evidentiary record, that the Impartial Hearing Finding Officer's Decision that C.B. was denied a Free and Appropriate Public Education (FAPE) under the IDEIA by the defendant and should be upheld; (c) a determination upholding the IHO's findings and decision that the Rebecca School is an appropriate placement for C.B. in his least restrictive environment for the twelve month 2011-12 school year; (d) a determination upholding the IHO's Findings and decision that the parents cooperated with the defendants and that equitable considerations favor granting tuition reimbursement to the Plaintiffs under Burlington/Carter; (e) a determination that the IHO properly held that plaintiffs amply met the applicable standards for full Burlington/Carter reimbursement relief relating to C.B.'s tuition and placement at the Rebecca School as well as C.B.'s additional and ancillary support services; (f) for an order directing defendants to provide direct funding under *Connors v. Mills*, for the Plaintiff student's tuition and costs at the Rebecca School for the 2011-12 twelve month (July 1 through June 30 school year; and (g) for an order granting plaintiffs leave to file a fee application pursuant to the fee shifting provisions of the IDEIA.

2.     C.B. was at all relevant times a student within the New York City Department of Education purview, entitled to all rights, entitlements and procedural safeguards mandated by applicable law, statutes and consent orders, including, but not limited to, the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C.

2

§ 1400 *et. seq.*, the pertinent implementing regulations promulgated under the Code

of Federal Regulations, Article 89 of the New York State Education Law, Part 200 of

the Commissioner's Regulations, and the 1988 *Jose P.* Consent Order.

**Parties:**

3.      Plaintiff C.B. is a six-year-old boy, born in 2006, with a disability classification

of Autism.

4.      Plaintiffs J.B. and L.B. are C.B.'s parents.

5.      J.B. and L.B. the parents, and C.B., the student, are not named herein by their

given names because of the privacy guarantees provided in  20 U.S.C. §1400 et seq.,

as well as in the Family Educational Rights Privacy Act 20 USC §1232(g) and §34 CFR

99

Plaintiffs are residents of the State of New York, residing at all relevant times at an

address within the New York City Department of Education's purview, and

currently residing in Brooklyn, New York, at an address within the Eastern District

of New York.

6.      Defendant New York City Department of Education (hereinafter "NYC DOE")

is located in the State and City of New York and is organized pursuant to the

Education Law of State of New York and regulations of the New York Commissioner

of Education and Board of Regents.  Defendant New York City Department of

Education is responsible for the overall operation and management of special education programs in accordance with federal and state law. Defendant New York City Department of Education is mandated and empowered pursuant to Article 89 of the New York State Education Law to identify all disabled children of school age in the school district and to provide free appropriate public education ("FAPE"). Defendant is a "local educational agency" as that term is defined in the 20 U.S.C. § 1401 (8) and received federal financial assistance as such.

7.      Both procedurally and substantively, defendant was and still is obligated under IDEIA, as well as the laws of the State of New York, to provide C.B. with a "free appropriate public education" ("FAPE").

## JURISDICTION AND VENUE

8.      Pursuant to 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. § 1331 and §1367, this Court has jurisdiction of this action without regard to the amount in controversy.

9.      Venue is proper in that plaintiffs and defendants reside or are situated within this judicial district.

## FACTUAL AND PROCEDURAL BACKGROUND

10.    C.B. is diagnosed as having a pervasive developmental disorder – not otherwise specified ("PDD-NOS") and has a classification of Autism.

11.    C.B. initially received special education services through the Committee on Preschool Special Education ("CPSE").  Beginning in July 2010, he attended a 6:1:3 special class where he was supported by a 1:1 behavior management paraprofessional and received related services of speech-language therapy and occupational therapy ("OT").  He also received ten hours a week of special education itinerant teacher ("SEIT") services.

12.    In March 2011, C.B.'s parents withdrew him from Francis of Paola Pre School, in part because of methods the school was using to restrain C.B.  C.B. continued to receive ten hours a week of SEIT services but he received no other services and no other program.

13.    C.B.'s parents informed the defendant that C.B. required immediate placement in an appropriate special education program beginning in March 2011.  No placement was offered by the defendant to C.B.

14.    On May 27, 2011, the Committee on Special Education ("CSE") met to create an Individualized Education Program ("IEP") for C.B. for the 2011-2012 school year.

15.    The IEP dated May 27, 2011, recommended placement of C.B. in a 6:1:1 special

class in a special school, related services of OT, speech-language therapy, a crisis

management paraprofessional and adaptive physical education, and notes that C.B.

has a Behavior Intervention Plan ("BIP").

16.    The IEP dated May 27, 2011, recommended that C.B. receive services on a 12-

month basis.

17.    At the May 27, 2011, IEP meeting, the school psychologist who was a member

of the CSE team told C.B.'s parent that the recommended placement for C.B. would

be in the same P.S. 178 building where the IEP meeting was being held but that she

should not send C.B. to that program, as it was inappropriate to meet her son's

educational needs.

18.    In a Final Notice of Recommendation ("FNR") dated June 20, 2011, the

Department of Education ("DOE") notified C.B.'s parents that the IEP team

recommended placement in a program located in the P.S. 178 building where the IEP

meeting was held, the very placement that the school psychologist at the IEP meeting

had said that C.B. should not attend.

19.    In a Nickerson letter dated June 24, 2011, the DOE notified C.B.'s parents that

the DOE "is not able to identify an appropriate placement site for your child." [The

Nickerson letter, issued pursuant to 1988 *Jose P.* Consent Order, presented as

evidence during Hearing as Exhibit F and attached hereto as Exhibit C)

20.     On June 24, 2011, C.B.'s parents signed an enrollment contract with the

Rebecca School for the school year commencing July 5, 2011 and ending June 22,

2012.

21.     On notice to defendant, by reason of defendant's failure to offer C.B. a FAPE

in his least restrictive environment, plaintiffs placed C.B. at the Rebecca School with

additional supports to promote the education of C.B. in his least restrictive

environment.

22.     C.B.'s placement at the Rebecca School was "reasonably calculated" for C.B. to

make meaningful educational progress in his least restrictive environment and C.B.

did, in fact, make meaningful progress in that program and placement.

23.     On July 5, 2011, at the start of the 2011-2012 12-month school year, C.B.'s

parents filed a due process complaint in which they requested an impartial hearing,

and a determination that the DOE denied C.B. a FAPE for the 2011-2012 school year,

that the Rebecca School was an appropriate placement for C.B., and that equitable

considerations supported an award of tuition costs to the parents.  The parents

sought prospective tuition reimbursement under <u>Connors v. Mills</u> 34 F. Supp. 2d 795

(N.D.N.Y. 1998).

24.    On July 18, 2011, the DOE filed a response to the due process complaint.

25.    An impartial hearing was held over three days, on October 31, November 30

and December 5, 2011.

26.    The Impartial Hearing Officer ("IHO") held, in a decision dated December 20,

2011, that the DOE failed to provide C.B. with a FAPE for the 2011-2012 school year,

that the Rebecca School was appropriate and met the needs of C.B., and that the

equities favored the parents. The IHO ordered the DOE to pay C.B.'s tuition at

Rebecca School for the 2011-2012 school year. [IHO's Decision, Exhibit B, attached

hereto]

27.    With respect to the DOE's failure to offer a FAPE to C.B., the IHO found that

the DOE's issuance of a Nickerson letter four days after it sent out the FNR

constitutes an admission that the recommended program was not appropriate.

28.    The IHO found that the DOE failed to meet its burden of proving that it

offered an appropriate placement for the 2011-2012 school year. [IHO's Decision,

attached hereto as Exhibit B]

29.    Upon appeal by the DOE to the State Review Officer ("SRO"), the SRO, in a

decision dated February 27, 2012, reversed the IHO, finding that the IHO erred in

concluding that defendant failed to offer C.B. a FAPE. The SRO did not address the

IHO's determination that the Rebecca School was an appropriate placement for C.B. and that the equitable considerations favored the parents. [SRO's Decision, Exhibit A, attached hereto]

30.     This action presents an appeal from the SRO's decision.

31.     Upon information and belief, the State Review Officer more often than not erroneously and arbitrarily reverses IHO decisions that award tuition reimbursement relief to the student and his or her parents, particularly if, as here, "prospective" funding is at issue.

32.     This action presents an appeal from the SRO's Decision.

33.     The SRO's Decision is erroneous and contrary to law and statute, standing as an arbitrary, rogue result that goes against the statutory and regulatory authority, the clear weight of the evidence, the applicable review standards set forth by the Second Circuit and the award that the IHO had properly rendered in C.B.'s favor based on, *inter alia*, the IHO's assessment of witness credibility, as well as a compelling evidentiary record.

34.     This Court, pursuant to the IDEIA, 20 U.S.C. § 1415, has broad remedial powers to take appropriate action to restore the relief that the SRO stripped away.

35.     The SRO's decision is erroneous and contrary to law and statute as an arbitrary result that goes against the clear weight of the evidence and the "reasonably

calculated" review standards set forth by the Second Circuit. This Court, pursuant to the IDEIA, 20 U.S.C. § 1415, has broad remedial powers to take appropriate action.

36.     It is undisputed that C.B., as described in his May 27, 2011, IEP, has severe deficits: his "levels of knowledge and development is delayed. He is not fully independent and requires supervision in regards to his daily living skills. He is not yet toilet trained. . .[his] intellectual functioning is delayed and below age expectancy. . .He has difficulty completing tasks independently. . He has difficulty with gross motor limitation skills, cannot identify body parts, colors, shapes, numbers or letters. [He] lacks the pre-requisite and attending skills considered to be age appropriate. . .[C.B.] exhibits communication delays. He is non-verbal. . .[C.B.] is able to follow simple 1 step directions. He understands the concept of 'no', but cannot indicate 'yes' or 'no' with a head nod. Due to [C.B.'s] communication delays and his inability to effectively communicate his needs, he can become injurious and self-injurious when he is not understood."

37.     Because of his severe deficits and his self-injurious behaviors, it is also not in dispute that, as stated in the IEP, "C.B. requires a highly structured and small educational program due to his cognitive and speech delays.  C.B. also displays behavioral issues that require constant adult supervision.  The parent is concerned about his injurious and self-injurious behaviors as well as his cognitive delays."

10

38.   C.B.'s self-injurious behaviors occurred when C.B. experienced frustration, when he was exposed to too much noise or activity, when too much structure was imposed on him and when he was deprived of the sensory input that his individual make-up requires. C.B.'s behaviors included hitting himself in the head, banging his head on the floor, rubbing his legs together until his knees bled and rubbing his arms under his chin until he bled. The photographs of the injuries he sustained as a result of these behaviors, taken in January of 2011 while C.B. was attending the Department of Education's recommended program and introduced at the impartial hearing, provide a graphic display of C.B.'s condition at that time. [Photographs - Ex. L at Hearing and attached hereto as Exhibit D)

39.   Because of his severe autism and his attendant deficits and behaviors, C.B. not only requires a highly structured and small educational program, but also a flexible program which uses the kind of "sensory diet" that is uniquely suited to CB's behavioral needs.

*Burlington/Carter Prong 1:*
*The Program/Placement and Services Offered By the DOE Are Inappropriate. <u>Sch. Comm. Of Burlington v. Dep't of Educ.</u>, 471 U.S. 359 (1985).*

40.   The burden of proof is on the DOE at an impartial hearing to show that it offered the student a FAPE. Educ. Law § 4404(1)(c)

41.     As the IHO found after hearing the witnesses and carefully and thoroughly

reviewing all of the evidence in the case, the DOE failed to meet its burden of proof

that it offered an appropriate placement for C.B. for the 2011-2012 school year.  [IHO

Decision, Exhibit B, p. 9]

42.     The final piece of correspondence from the DOE to C.B.'s parents

acknowledges that the DOE "is not able to identify an appropriate placement for

your child."

43.     The DOE's admission – in evidentiary terms, an admission against interest –

that it could not identify an appropriate program was never rescinded and never

explained, even though the IHO, at the impartial hearing, specifically requested an

explanation from the DOE.

44.     C.B.'s parents relied on the Nickerson Letter, and diligently called every

school on the list of approved private schools that had been sent to them with the

Nickerson Letter, but did not find an opening that was appropriate for C.B.  [The

Nickerson letter, issued pursuant to 1988 Jose P. Consent Order, presented as

evidence during Hearing as Exhibit F and attached hereto as Exhibit C)  *(See Jose P. v.*

*Ambach,* 553 IDELR 298, No. 79 Civ. 270 [E.D.N.Y. Jan. 5, 1982]

45.     The DOE's unexplained and unrescinded admission alone indicates its failure, under Prong 1 of Burlington/Carter, to prove that it offered C.B. an appropriate program.

46.     Moreover, the DOE made no attempt to prove that the placement offered in the FNR was an appropriate program.

47.     The DOE although it had ample opportunity to do so failed to present even a single witness who could speak about P077K, the placement recommended in the June 20, 2011 FNR.

48.     The DOE failed to present any non-testimonial evidence about P077K.

49.     It is self-evident that the DOE could not present a *prima facie* case and could not satisfy its burden of proof that it offered an appropriate program when it failed to present any evidence about that program.

50.     PO77K is on the 5th floor of a building which houses a general education school with 600 students, grades K through 8, on its first four floors.  The building has no elevator.

51.     In addition, the few facts about P077K that were elicited at the impartial hearing indicate that it would not have been an appropriate program for C.B.

52.     C.B. accompanied his mother to the May 27, 2011 IEP meeting that was held on the fourth floor of the same building, and the loud noise and activity of the

students in the hallways and staircases of the general education school caused C.B. to engage in tantruming and self-injurious behavior even though his mother was with him.

53.    A placement where C.B. would have been forced to endure the overstimulation of that environment twice a day, when he arrived at school and when he departed from school, was not reasonably calculated to confer education benefits on C.B. and was not appropriate for a student with C.B.'s severe behavioral issues.

54.    The DOE's failure to sustain its Prong 1 burden is demonstrated by (1) the admission against interest contained in the Nickerson letter's acknowledgement that the DOE "is not able to identify an appropriate placement for your child," (2) the DOE's failure to present any proof at the impartial hearing, either testimonial or documentary, that the placement recommended in the FNR is appropriate, and (3) the showing that the only facts elicited about the location of the recommended placement, and about C.B.'s reaction to that location, indicate that it is inappropriate to the individualized needs of C.B. and not reasonably calculated to confer educational benefits to C.B.

55.    The Impartial Hearing Officer's decision was through, careful and fair and based on legal standards in deciding that the DOE did not offer C.B. a FAPE.

56.    The State Review Officer's Decision is random, arbitrary and capricious and ignored the weight of the evidence in annulling and reversing the Hearing Officer's decision.

57.    On this appeal which is in the nature of a modified de novo review, this Court should independently review the underlying record. This Court is entitled to apply a pure de novo approach, including an evidentiary hearing, to questions of law and mixed questions of law and fact.

58.    Where, as here, the underlying SRO decision on appeal is not supported by the existing record, or is clearly erroneous on the law, or contrary to statutory and regulatory authority, the reviewing court need not accord much, if any, weight or deference to the administrative fact-finding of the State Review Officer. See Evans v. Bd. of Educ., 930 F. Supp. 83, 93 (S.D.N.Y. 1996). See also R.E., 2011 U.S. Dist. LEXIS 26537; R.K., 2011 U.S. Dist. LEXIS 32248.

59.    Plaintiff/parents have exhausted their administrative remedies and are themselves exhausted after prevailing at the IHO level only to have all the IHO-awarded relief stripped away arbitrarily by the SRO.

15

*Burlington/Carter Prong II: The Rebecca School is appropriate*
*and meets C.B.'s Educational Needs in his Least Restrictive environment.*

60.     When the DOE failed to identify an appropriate placement for C.B., C.B.'s

parents immediately notified the DOE that C.B. had been accepted to the Rebecca

School and would be attending the Rebecca School beginning in July 2011.

61.     The IHO correctly determined that the Rebecca School is an appropriate

placement for C.B., as it addresses his individualized needs and his needs as set forth

in his IEP. [IHO's Decision, p. 13].

62.     The SRO did not address the appropriateness of the parents' placement and

did not disturb the IHO's findings on this issue. [SRO's Decision, p. 12]

63.     The decision of the IHO with respect to the appropriateness of the Rebecca

School is the law of the case.

64.     The Rebecca School provides C.B. with an intense sensory program which has

increased C.B.'s ability to focus and to attend to his education. The Rebecca School

provides C.B. with occupational therapy three times a week (for thirty minutes a

session), speech therapy four times a week (for thirty minutes a session) and a 1:1

paraprofessional. As a result, C.B. has made significant progress in his areas of

deficit, including in his ability to attend and to communicate, and he engages in far

16

less self-injurious behavior and dysregulation than was the case before he attended the Rebecca School.

65.    The progress that C.B. has made since starting at the Rebecca School in July 2011 is significant, and demonstrates that the program is working for C.B. and is his least restrictive environment.

*Burlington/Carter Prong III:*
*Equitable Considerations  Support the Parents'*
*Claim for Direct Funding under Connors v. Mills.*

66.    The IHO correctly determined that the parents cooperated with the CSE and that the equities favor the parents. [IHO Decision, p. 14]

67.    The SRO made no determination on the issue of whether equitable considerations support the parents and did not disturb the IHO's findings on this issue. [SRO Decision, p. 12]

68.    The decision of the IHO with respect to the equities in favor of the plaintiff/parents is the law of the case.

69.    C.B.'s parent attended all meetings of the CPSE and CSE

70.    C.B.'s parent diligently contacted and considered all schools suggested by the DOE.  Even after C.B.'s parents had signed a contract to enroll C.B. in the Rebecca School, the parents considered all of the DOE's suggestions and would have enrolled C.B. in an appropriate program other than the Rebecca School had one been

(c)     declare that the IHO properly held that C.B.'s placement at the Rebecca School was "reasonably calculated" to provide C.B. with meaningful educational benefits in C.B.'s least restrictive environment (Prong II);

(d)     declare that the IHO properly held that equities favor the plaintiffs (Prong III);

(e)  declare and order that the Defendant pay to the Rebecca School C.B.'s tuition for the twelve month 2011-12 school year; (*Connors v. Mills*);

(f)     declare plaintiffs to be the prevailing party and grant leave to plaintiffs to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs recorded at the administrative level and in this action, pursuant to the express fee-shifting provisions of the federal IDEIA statute; and

(g)     grant plaintiffs such other, further and different relief as may be just under the circumstances.

Dated:     New York, New York
           May 24, 2012

                              LAW OFFICES OF GEORGE ZELMA

                              By: _David Berlin_

                                   David Berlin
                                   George Zelma
                              888 Seventh Avenue, Suite 4500
                              New York, New York 10106
                              Tel.: (212) 247-4650

19

# EXHIBIT A

# EXHIBIT A



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 12-021

Application of the ██████████████████████
████████████ for review of a determination of a hearing
officer relating to the provision of educational services to a
student with a disability

**Appearances:**

Michael Best, Special Assistant Corporation Counsel, attorneys for petitioner, Diane da Cunha, Esq., of counsel

Law Offices of George Zelma and David Berlin, attorneys for respondents, David Berlin, Esq., of counsel

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioner (the district) appeals from the decision of an impartial hearing officer (IHO) which found that it failed to offer an appropriate educational program to respondents' (the parents') son and ordered it to pay for the student's tuition costs at the Rebecca School for the 2011-12 school year. The appeal must be sustained.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, at least one psychologist, and school district representatives (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the

opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; 34 CFR 300.151-300.152, 300.506, 300.511; Educ. Law § 4404[1]; 8 NYCRR 200.5[h]-[l]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2],[c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and, is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.514[c]; 8 NYCRR 200.5[k][2]).

**III. Facts and Procedural History**

As a young child the student was diagnosed as having a pervasive developmental disorder – not otherwise specified (PDD-NOS) and received services through the Early Intervention Program and Committee on Preschool Special Education (CPSE) (Dist. Exs. 8 at p. 1; 10 at p. 10; see Tr. pp. 429-30). In July 2010, he began attending a 6:1+3 special class where he was supported by a 1:1 behavior management paraprofessional and received related services of speech-language therapy and occupational therapy (OT) (Tr. pp. 52-54; Dist. Exs. 2 at p. 1; 5;

6; 7; 12). In addition he received 10 hours a week of special education itinerant teacher (SEIT) services (Dist. Exs. 2 at p. 1; 5; 7; 12).

On February 10, 2011, the CPSE met for an annual review of the student's program (Dist. Ex. 13). Due to the severity of the student's delays, the CPSE recommended continuation of the student's eligibility for special education and related services as a preschool student with a disability and placement in a 6:1+3 center-based special class with the support of a 1:1 behavior management paraprofessional and related services of speech-language therapy and OT (id. at pp. 1, 14, 16). In addition, the CPSE recommended that the student continue to receive 10 hours a week of SEIT services (id. at p. 1). The CPSE suggested that the student's behavior "required" highly intensive supervision and attached a behavioral intervention plan (BIP) to the proposed IEP (id. at pp. 4, 17). The CPSE recommended that the student receive his IEP services on a 12-month basis (id. at p. 1). The February 10, 2011 IEP reflected the names of the agencies assigned to provide the student's center-based preschool program and SEIT services.

On or about March 26, 2011, the parents notified the district that they were withdrawing the student from the center-based preschool program due to concerns regarding the methods employed by the school to restrain the student (Tr. pp. 181-82, 450; see Parent Ex. D). The student continued to receive SEIT services in accordance with his February 2011 IEP (Tr. pp. 182, 188).

On May 27, 2011, the CSE met to determine the student's eligibility for school-age special education services and to create the student's IEP for the 2011-12 school year (Dist. Ex. 1; see also Parent Ex. A). The CSE determined that the student was eligible for special education and related services as a student with autism, and recommended that he be placed in a 6:1+1 special class in a special school (Dist. Ex. 1 at pp. 8, 11).[1] The CSE further recommended that the student receive the related services of OT, speech-language therapy, a crisis management paraprofessional, and adaptive physical education and created a BIP for the student (id. at pp. 2, 8, 11, 16). The CSE also recommended that the student receive services on a 12 month basis (id. at p. 9).

By letter dated June 13, 2011, the parents notified the district that they were withdrawing the student from the district's schools due to the district's failure to offer an appropriate school that could address the student's needs (Parent Ex. D). According to the parents, the school psychologist advised them during the May 2011 CSE meeting that a classroom on the fifth floor of the building that they were having their CSE meeting in would be recommended for the student, that there was no elevator in the building, that classroom staff was using methods that were unfamiliar to the school psychologist, and that the school psychologist concluded "[y]ou won't want to send [the student] here" (id.). The student attended the May 2011 CSE meeting, and, therefore, the parents concluded that the school psychologist based his opinion on "his observation of [the student's] challenges and [the] need for [an] appropriate placement" (id.). The parents further advised the district in their June 2011 letter that they would be unilaterally placing the student at the Rebecca School starting on July 1, 2011 and seeking payment of the student's tuition from the district (id.). The parents also notified the district that while the student

---

[1] The student's eligibility for special education and related services as a student with autism is not in dispute in this proceeding (see 34 CFR § 300.8[c][1]; 8 NYCRR 200.1[zz ][1]).

continued to receive his SEIT services at home since being withdrawn from his preschool placement, he has not been receiving OT or speech-language therapy (id.).

In a letter dated June 20, 2011, the district summarized the recommendations made by the May 2011 CSE and identified the particular school to which it assigned the student for the 2011-12 school year (Parent Ex. E).

On June 23, 2011, the parents paid a $500 non-refundable deposit to the Rebecca School for the 2011-12 school year (Parent Ex. G at p. 5). The Rebecca School is a nonpublic school that has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7).

On June 24, 2011, the district sent the parents a Nickerson letter, advising the parents that it was unable at that time to identify an appropriate placement site for the student (Parent Ex. F). The letter further stated that the parents had "the legal right to place your child in an appropriate special education program" at any State "approved private day school" and receive payment from the district for the tuition and transportation costs (id.). According to the hearing record, the letter contained an attached list of State-approved nonpublic schools (id.).[2]

On June 24, 2011, the parents signed an enrollment contract with the Rebecca School for the student's tuition for the school year commencing July 5, 2011 and ending June 22, 2012 (Parent Ex. G).

### A. Due Process Complaint Notice

The parents filed a due process complaint notice on July 5, 2011, in which they requested an impartial hearing to adjudicate their claim for payment of the student's tuition costs at the Rebecca School for the 2011-12 school year (Parent Ex. B). The parents sought a determination that district denied the student a free appropriate public education (FAPE) for the 2011-12 school year (id. at p. 6). The parents asserted that the district's recommended program was inappropriate for the student because he required a 12-month program in a small, self-contained classroom at a nonpublic school (id. at pp. 3-5). The parents also asserted that the assigned school was inappropriate because the classroom was located on the fifth floor of a large school building that lacked an elevator (id. at p. 4). In addition, the parents asserted that the Rebecca School was an appropriate placement for the student and that equitable considerations supported an award of tuition costs to the parents (id. at pp. 5-7).

The district filed a response to the due process complaint notice on July 18, 2011, asserting that it had offered the student a FAPE for the 2011-12 school year (Parent Ex. C).

### B. IHO Decision

An impartial hearing convened on October 31, 2011 and concluded on December 5, 2011, after three hearing days (Tr. pp. 1, 162, 209). In a decision dated December 20, 2011, the IHO first determined that the issuance of the Nickerson letter by the district four days after it sent

---

[2] The attachment with the list of approved schools was not made part of the hearing record.

its June 20, 2011 notice identifying the school to which it assigned the student constituted an admission by the district that the program at the assigned school was inappropriate, and that since no other placement was offered by the district thereafter, the district had failed to meet its burden of proof that it had offered the student an appropriate placement for the 2011-12 school year (IHO Decision at pp. 8-9).

The IHO next addressed the appropriateness of the Rebecca School (IHO Decision at pp. 9-13). The IHO determined that the student's needs, as set forth in the May 2011 IEP, were being met at the Rebecca School, and therefore the Rebecca School was an appropriate placement (id. at p. 13). The IHO noted that the director and the student's then-current teacher at the Rebecca School described the student's program at the Rebecca School, including his sensory diet, OT sessions, and speech therapy (id. at pp. 11-13). The Rebecca School director further testified that the student had made progress at the Rebecca School in that he remained regulated for longer periods of time, used more vocalizations and gestures when communicating, was able to attend for longer periods of time, and his self-injurious behavior decreased (id. at p. 11).

With regard to equitable considerations, the IHO determined that the parents cooperated with the district and provided notice to the district that they would be placing the student at the Rebecca School (IHO Decision at pp. 13, 14). Based on these findings, the IHO ordered the district to pay the student's tuition at the Rebecca School for the 2011-12 school year (id. at p. 15).

## IV. Appeal for State-Level Review

The district appeals from the IHO's decision. In its appeal, the district asserts that the IHO erred in finding a denial of a FAPE based upon the issuance of the Nickerson letter. Specifically, the district asserts that the due process complaint notice did not raise any issue concerning the Nickerson letter and therefore there was an inappropriate basis for the IHO to determine that the district failed to offer the student a FAPE. The district also asserts that the Nickerson letter was irrelevant because it was issued on June 24, 2011 after the parents had advised the district by letter dated June 13, 2011 that they were withdrawing the student from the district's schools. According to the district, the IHO should have limited her decision to allegations raised in the due process complaint notice, which were that the assigned school was inappropriate because the classroom was located on the fifth floor of a large school building with no elevator, and that the district did not offer the student a 12-month program. Regarding these allegations by the parents, the district first asserts that the student never attended the district's assigned school and therefore the parents' assertions were speculative, and alternatively were without merit as there was no evidence that the student could not climb stairs and accommodations could have been provided to address any concerns that may have arose. Second, the district asserts that the May 2011 CSE offered the student a 12-month program that started in September pursuant to New York State Education law because the student was transitioning from a preschool program to a school age program. According to the district, the student's February 2011 IEP developed by the CPSE provided a program for July and August 2011 that was rejected by the parents except for the SEIT services.

The district also argues that the IHO erred in finding the Rebecca School an appropriate unilateral placement because it was only a 10-month program and the student required a 12-

month program. Furthermore, the district asserts that contrary to the student's needs, the Rebecca School did not provide the student with OT during the summer, did not provide a 1:1 crisis paraprofessional during the student's bus ride, and that the student endured a long bus ride to and from the Rebecca School. Regarding equitable considerations, the district contends that the parents had no intention of having the student attend a public school, and therefore they are not entitled to an award of tuition costs.

As relief, the district requests annulment of the IHO's decisions that the district failed to offer the student a FAPE for the 2011-12 school year, that the Rebecca School was an appropriate placement, and that equities favored the parents. The district further requests reversal of the IHO's award of the student's tuition at the Rebecca School for the 2011-12 school year.

In their answer, the parents deny the district's allegations with respect to the contested issues. The parents assert that the district's June 20, 2011 notice of placement was superseded by the issuance of the Nickerson letter. The parents also assert they withdrew the student from the preschool center based program after his mother observed school staff physically restraining the student and that the district was aware that the student had not been attending school since March 2011 and required a summer program, but that the district chose to do nothing to address the student's needs for an appropriate program. The parents also assert that the assigned school was inappropriate because the student would have to walk up and down five flights of stairs through a large school with approximately 600 students, and the student would become over-stimulated from the noise and activity, resulting in tantrums and self-injurious behavior.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; A.H. v. Dep't

6

of Educ., 2010 WL 3242234, at *2 [2d Cir. Aug. 16, 2010]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. Dep't of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008] [noting that a CSE must consider, among other things, the "results of the initial evaluation or most recent evaluation" of the student, as well as the "'academic, developmental, and functional needs'" of the student), establishes annual goals designed to meet the student's needs resulting from the student's disability enabling him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents

were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

## VI. Discussion

### A. Nickerson Letter

The district asserts that the IHO erred in determining that it had failed to offer the student a FAPE based upon the issuance of the June 24, 2011 Nickerson letter. As further described below I agree that the IHO's decision must be reversed on this point.

A "Nickerson letter" is a remedy for a systemic denial of FAPE that was imposed by the U.S. District Court based upon a class action lawsuit, and this remedy is available to parents and students who are class members in accordance with the terms of a consent order (see R.E. v. New York City Dept. of Educ., 785 F.Supp.2d 28, 44 [S.D.N.Y. 2011]). The Nickerson letter remedy authorizes a parent to immediately place the student in an appropriate special education program in a State-approved nonpublic school at no cost to the parent (see Jose P. v. Ambach, 553 IDELR 298, No. 79 Civ. 270 [E.D.N.Y. Jan. 5, 1982]). The remedy provided by the Jose P. decision is intended to address those situations in which a student has not been evaluated within 30 days or placed within 60 days of referral to the CSE (id.; M.S. v. New York City Dep't of Educ., 734 F. Supp. 2d 271, 279 [E.D.N.Y. Aug. 25, 2010]; see Application of the Bd. of Educ., Appeal No. 03-110; Application of a Child with a Disability, Appeal No. 02-075; Application of a Child with a Disability, Appeal No. 00-092; see also Tr. pp. 146-47). In this case, there is no dispute that the district issued the Nickerson letter (Parent Ex. F), but there is no evidence in the hearing record to explaining why (see, e.g., Tr. p. 147). Although the IHO treated the issuance of the Nickerson letter as an admission of a denial of a FAPE, I am hard pressed to see how the issuance of this court ordered remedy for a denial of a FAPE constitutes a basis, in and of itself, for finding a denial of a FAPE. Furthermore, the student's evaluations are not in dispute, nor is the timeliness of the district's offer of an IEP and the assignment of the student to a particular school (Tr. pp. 8-12; Parent Ex. B). By virtue of its issuance, the evidence regarding the Nickerson letter shows that the parent became entitled to send the student to a state-approved non-public school in addition to the public school placement offered by the district, but discussion of the Nickerson letter is of only marginal relevance to the parents' claims in their due process complaint notice that the district failed to offer the student a FAPE.

8

I further note that jurisdiction over class action suits and consent orders (and by extension, stipulations containing injunctive relief) issued by the lower federal courts rests with the district courts and circuit courts of appeals (see 28 U.S.C. § 1292[a][1]; Fed. R. Civ. P. 65; see, e.g., Weight Watchers Intern., Inc. v. Luigino's, Inc., 423 F.3d 137, 141-42 [2d Cir. 2005]; Wilder v. Bernstein, 49 F.3d 69 [2d Cir. 1995]; Pediatric Specialty Care, Inc. v. Arkansas Dept. of Human Services, 364 F.3d 925 [8th Cir. 2004]; M.S., 734 F. Supp. 2d at 279; E.Z.-L. v. New York City Dep't of Educ., 763 F. Supp. 2d 584, 594 [S.D.N.Y. 2011]). No provision of the IDEA or the Education Law confers jurisdiction upon a state educational agency or a local educational agency to sit in review of or resolve disputes over injunctions or consent orders issued by a judicial tribunal. Consequently, neither the impartial hearing officer, nor I for that matter, have jurisdiction to resolve a dispute regarding whether the student is a member of the class in Jose P., the extent to which the district may be bound or may have violated the consent order issued by a district court, or the appropriate remedy for the alleged violation of the order (R.K. v. New York City Dep't of Educ., 2011 WL 1131492, *17 n.29 (E.D.N.Y. Jan. 21, 2011); W.T. v. Bd. of Educ., 716 F. Supp. 2d 270, 289-90 n.15 [S.D.N.Y. Apr. 15, 2010]; see M.S., 734 F. Supp. 2d at 279 [addressing the applicability and parents rights to enforce the Jose P. consent order]; Levine v. Greece Cent. School Dist., 2009 WL 261470, *9 [W.D.N.Y. 2009] [noting that the Second Circuit has consistently distinguished systemic violations such as those in Handberry v. Thompson (436 F.3d 52 [2d Cir. 2006]) and Jose P. to be addressed by the federal courts, from technical questions of how to define and treat individual students' learning disabilities, which are best addressed by administrators]; Application of a Student with a Disability, Appeal No. 10-115; see also R.E. v. New York City Dep't of Educ., 2011 WL 924895, *12 [S.D.N.Y. Mar. 15, 2011]; E.Z.-L., 763 F. Supp. 2d at 594; Dean v. School Dist. of City of Niagara Falls, 615 F. Supp. 2d 63, 70 [W.D.N.Y. 2009]). In view of the forgoing, I find that the impartial hearing officer should have ruled on the allegations of wrongdoing by the district that the parent identified in their due process complaint notice.

**B. 12-Month Program**

Next, I will address the parties' dispute about whether the district offered the student a program in July and August 2011. According to Education Law § 4410(1)(i) a child is a "preschool child," and thus the responsibility of the CPSE for programming purposes, "through the month of August of the school year in which the child first becomes eligible to attend school pursuant to section thirty-two hundred two of this chapter."

The IEP developed on February 10, 2011 indicated that the student was eligible for summer services through the CPSE (Dist. Ex. 13 at p. 1). In March 2011 the parents notified the district's preschool administrator that they were withdrawing the student from the preschool center-based program (Tr. pp. 181-84, 450, see Parent Ex. D). The principal of the preschool center-based program testified that her school would have had a summer program available for the student (Tr. p. 51). She also testified that in April 2011 she was told by the district to discharge the student (Tr. p. 84). Although the parent removed the student from the preschool, the evidence shows that the student continued to receive 12-month SEIT services in accordance with his February 2011 IEP through August 2011 (Tr. pp. 189, 323, 336, 348). The hearing record also shows that the CSE recognized the student's need to receive a 12-month program, and that this was annotated on the student's May 2011 IEP (Dist. Ex. 1 at p. 9). Under the circumstances of this case in which the parents removed the student from the preschool center-

9

based program, did not challenge the February 2011 IEP or the CPSE's actions in their due process complaint, the student otherwise actually received SEIT services in accordance with the applicable February 2011 IEP, and the May 2011 IEP continued the notation of the student's need for 12-month services, I decline to find a denial of a FAPE for the 2011-12 school year due to the alleged lack of summer services in a school-aged program.

### C. Assigned School

I will now consider the parties contentions regarding the appropriateness of the assigned school. In this case, a meaningful analysis of the parents' claim that the assigned school was inappropriate would require me to determine what might have happened had the district been required to implement the student's IEP. While parents are not required to try out the school district's proposed program (Forest Grove, 129 S.Ct. at 2496), I note that the Second Circuit has established that "'educational placement' refers to the general educational program – such as the classes, individualized attention and additional services a child will receive – rather than the 'bricks and mortar' of the specific school" (T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 419-20, cert. denied, 130 S. Ct. 3277 [2010]; see K.L.A. v. Windham Southeast Supervisory Union, 2010 WL 1193082, at *2 [2d Cir. Mar. 30, 2010]; Concerned Parents & Citizens for the Continuing Educ. at Malcolm X Pub. Sch. 79 v. New York City Bd. of Educ., 629 F.2d 751, 756 [2d Cir. 1980]). While statutory and regulatory provisions require an IEP to include the "location" of the recommended special education services (20 U.S.C. § 1414[d][1][A][i][VII]; 34 CFR 320[a][7]; 8 NYCRR 200.4[d][2][v][b][7]), it does not follow that an IEP must identify a specific school site (T.Y., 584 F.3d at 419-20). Further, the assignment of a particular school is an administrative decision provided it is made in conformance with the CSE's educational placement recommendation (Letter to Veasey, 37 IDELR 10 [OSEP 2001]). The hearing record demonstrates that the district, prior to the start of the new school year, provided the parents with notice of the location where the district sought to implement the May 2011 IEP (Parent Ex. E). The hearing record also demonstrates that the proposed classroom conformed to the CSE's educational placement recommendation, and that the parents did not assert in their due process complaint notice that a 6:1+1 special class placement was inappropriate. The essence of the parents' complaint was that the proposed classroom was located on the fifth floor of a large school building that had no elevator, and, the assigned school was in a public school setting (Parent Ex. B at p. 5). The IDEA and State regulations provide parents with the opportunity to offer input in the development of a student's IEP; however, they do not permit parents to direct through veto a district's efforts to implement each student's IEP (see T.Y., 584 F.3d at 420).

Once a parent consents to a district's provision of special education services, such services must be provided by the district in conformity with the student's IEP (20 U.S.C. § 1401[9][D]; 34 CFR 300.17[d]; see 20 U.S.C. § 1414[d]; 34 CFR 300.320). With regard to the implementation of a student's IEP, a denial of a FAPE occurs if the district deviates from substantial or significant provisions of the student's IEP in a material way and thereby precludes the student from the opportunity to receive educational benefits (A.P. v. Woodstock Bd. of Educ., 2010 WL 1049297 [2d Cir. March 23, 2010]; see Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811 [9th Cir. 2007]; Houston Independent School District v. Bobby R., 200 F.3d 341 at 349 [5th Cir. 2000]). However, with regard to the health or safety of a student with a disability, a school district denies the student the benefits guaranteed by the IDEA if it proposes a placement that threatens a student's health in a manner that undermines his or her ability to learn (A.S. v.

10

Trumbull Bd. of Educ., 414 F. Supp. 2d 152, 178; citing Lillbask v. Conn. Dep't of Educ., 397 F.3d 77, 93 [2d Cir. 2005] [noting that Congress did not intend to exclude from consideration any subject matter, including safety concerns, that could interfere with a disabled student's right to receive a FAPE]; L.K. v. Dep't of Educ., 2011 WL 127063, at *9 [E.D.N.Y. Jan. 13, 2011] [finding failure to identify a serious allergy to citrus fruits on a student's IEP did not constitute a denial of a FAPE]).

In this case, the parents rejected the IEP and enrolled the student at the Rebecca School prior to the time that the district became obligated to implement the student's IEP. Even assuming for the sake of argument that the student had attended the district's recommended program, the evidence in the hearing record nevertheless does not support the conclusion that the district would have deviated from the IEP in a material way (A.P., 2010 WL 1049297 [2d Cir. March 23, 2010]; Van Duyn, 502 F.3d at 822; see D.D.-S. v. Southold U.F.S.D., 2011 WL 3919040, at *13 [E.D.N.Y. Sept. 2, 2011]; A.L. v. Dep't of Educ., 2011 WL 4001074, at *9 [S.D.N.Y. Aug. 19, 2011]), or that the assigned school threatened the student's health in a manner that would have undermined his ability to learn (A.S., 414 F. Supp. 2d at 178; L.K., 2011 WL 127063, at *9). The preschool administrator confirmed that the assigned school was on the fifth floor of a building that housed two schools; the assigned school, which enrolled approximately 40 students and a kindergarten through eighth grade school, which enrolled approximately 600 students (Tr. pp. 135, 140, 142). The school building did not have a working elevator (Tr. pp. 140, 447). The evidence also shows that the student did not have gross motor delays and that he was able to navigate stairs, although he tended to move quickly on them (Tr. pp. 150, 250, 265-66, 277, 301, 425). However, the hearing record also shows that the student was sensitive to noise, that it could provoke the student's anxiety, and that at times it served as a trigger for the student's self-abusive behaviors (Tr. pp. 156-57, 272, 331, 445; Dist. Ex. 6 at p. 1).

The school administrator acknowledged that the student's mother expressed concerns with respect to the student's ability to navigate four flights of stairs in a school with so many students where there was so much noise and activity, but that he did not agree with them (Tr. p. 143). He testified that he advised the student's mother regarding her concerns which could be raised with a placement officer, who would work with her to identify options for other schools (Tr. pp. 142-45). The preschool administrator also testified that the student would never be alone in the assigned school, would always be accompanied by his paraprofessional, and the paraprofessional would address any issues the student had with crowds or noise (Tr. pp. 150-51, 158).

Based on the foregoing, there is no showing in the hearing record that the district would have deviated from substantial or significant provisions of the student's IEP in a material way and thereby precluded him from the opportunity to receive educational benefits (Rowley, 458 U.S. at 206-07; A.P., 2010 WL 1049297, at *2). Although one can understand the parents' preferences for a school with an elevator and a small student population,[3] their preferences expressed after the CSE meeting in this instance do not equate to a violation of the district's

---

[3] In view of his testimony, the parents' description of the school psychologist's statements regarding the assigned school described above may be viewed similarly as ideals regarding the particular school setting and not an opinion that CSE intentionally designed a program it knew to be inadequate to address the student's needs (see Tr. p. 143; Parent Ex. D).

obligation to offer the student the basic floor of opportunity through an IEP that was reasonably calculated to enable the student to receive educational benefits (see Grim, 346 F.3d at 379).

**VII. Conclusion**

Having determined that the impartial hearing officer erred in concluding that the district failed to offer the student a FAPE for the 2011-12 school year, the necessary inquiry is at an end and it is not necessary to address the remaining Burlington/Carter factors such as the appropriateness of the parent's placement of the student at Rebecca School or the extent to which equitable considerations support the parents or the district (see Burlington, 471 U.S. at 370; M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134; C.F. v. New York City Dept. of Educ., 2011 WL 5130101, at *12 [S.D.N.Y. Oct. 28, 2011]). I have considered the parties' remaining contentions and find that I need not address them in light of my determinations herein.

**THE APPEAL IS SUSTAINED.**

**IT IS ORDERED** that the impartial hearing officer's decision dated December 20, 2011 is modified by reversing those portions which determined that the district failed to offer the student a FAPE for the 2011-12 school year and directed the district to pay for the student's tuition costs at the Rebecca School.

**Dated:**     **Albany, New York**
              **February 27, 2012**                        **JUSTYN P. BATES**
                                                           **STATE REVIEW OFFICER**

# EXHIBIT B

# EXHIBIT B

# FINDINGS OF FACT AND DECISION

Case Number:                         133972

Student's Name:                      C█ B██████

Date of Birth:                       ████████████

District:                            2

Hearing Requested By:                Parent

Date of Hearing:                     October 31, 2011
                                     November 30, 2011
                                     December 5, 2011

Actual Record Closed Date:           December 15, 2011

Hearing Officer:                     Diane Cohen, Esq.

Hearing Officer's Findings of Fact and Decision                                    1

Case No. 133972

## NAMES AND TITLES OF PERSONS WHO APPEARED OCTOBER 31, 2011

| Lisa | Mother | |
| James | Father | |
| Juan Pucha | Attorney for DOE | |
| David Berlin | Attorney for Parents | |
| Teresa Del Priore | Principal, Francis Di Paola | DOE |
| Joseph Pravata | School Psychologist | DOE |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON NOVEMBER 30, 2011

| Lisa | Mother | |
| Juan Pucha | Attorney for DOE | |
| David Berlin | Attorney for Parents | |
| James Meditz (T) | CPSE Administrator | DOE |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON DECEMBER 5, 2011

| Lisa | Mother | |
| Juan Pucha | Attorney for DOE | |
| George Zelma | Attorney for Parents | |
| Tina McCourt | Program Director, Rebecca School | Parents |
| Jennifer Bloodnick | SEIT | Parents |
| Yael Rubinstein | Classroom teacher, Rebecca School | Parents |

Hearing Officer's Findings of Fact and Decision                                        2:

Case No. 133972

## BACKGROUND

On July 8, 2011, I was appointed hearing officer pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415(f)(1), in this matter. The Parents requested a hearing, asserting that the program recommended by the Committee on Special Education (the "CSE") was inappropriate in that it was a ten month program rather than a twelve month program. They also asserted that the placement site offered was inappropriate. The Parents assert that the Student requires a small self-contained special education class in a non-public school, using a multi-sensory approach, and that provides physical therapy, occupational therapy and speech and language therapy and other supports for the Student. They assert that they have unilaterally placed the Student at the Rebecca School. They assert that they have fully cooperated with the New York City Department of Education (the "DOE") and the CSE, and are entitled to tuition reimbursement and transportation costs for the Rebecca School. They are requesting direct prospective tuition payment under *Connors v. Mills*, 34 F.Supp.2d 795 (N.D.N.Y. 1998) for the 2011-2012 school year, and assert that they are financially unable to pay the tuition directly to the Rebecca School (Exh. B).

The DOE asserts in its response, among other things, that it offered an appropriate placement on June 20, 2011, in a final notice of recommendation for a placement at PS077K@PS178K (Exh. C, p. 3).

## EVIDENCE

The Parents submitted as evidence a "Nickerson Letter", dated June 24, 2011, indicating that the DOE was not able to identify an appropriate placement site and authorizing the Parents to place their child in a New York State Education Department approved private day school. (Exh. F)

The Parents also submitted a contract with the Rebecca School for the 2011-2012 school year and other documentation regarding payment (Exh. G, I, J); as well as a tax return for 2010, as proof of inability to pay the cost of the Rebecca School. (Exh. K)

The Parents also submitted a letter, dated June 13, 2011, indicating that they were removing the Student from the public school system and would be seeking tuition reimbursement. (Exh. D)

The DOE submitted an individualized education program, dated May 27, 2011 (Exh. 1). The IEP indicated that the Student was classified as having autism (Exh. 1, p. 1), and indicates that the Student "requires a highly structured and small educational program due to his cognitive and speech delays. He also displays behavioral issues that require constant adult supervision." (Exh. 1, p. 1). The IEP indicates that the Committee on Special Education (the "CSE") recommended a 6:1:1 class with related services of speech and language therapy three periods per week (30 minutes each session) in a group of one; occupational therapy three periods per week (30 minutes each session) in a group of one; and a full time crisis management paraprofessional (Exh. 1, p. 8). A twelve month program was recommended (Exh. 1, p. 9). A functional behavior assessment ("FBA") is attached to the IEP and indicates that the Student has self-injurious behaviors and aggression towards staff and peers. These are noted to occur daily for one to five minutes, with a mild intensity. The FBA notes that the self-injurious behaviors occur when limits and structure are set. (Exh. 1, p. 14)

A behavior intervention plan (a "BIP") is attached to the IEP. The BIP indicates that the method to achieve improvement in the targeted behavior will include: "Teachers' and Providers' observation" and "Behavioral Charting" (Exh. 1, p. 16)

The DOE submitted an Educational Progress Report, dated January 28, 2011, as an exhibit. The report indicates that the Student "has the propensity to engage in stereotypical, injurious, and self-injurious behavior whenever structure is imposed. Due to the severity of the aforementioned behaviors, [the Student] has difficulty attending to instruction." (Exh. 2, p. 1) The report further indicates that the Student "requires full physical prompting from instructors when presented with a new task." He is "not yet toilet trained. He frequently licks, smells, mouths objects, and engages in Pica." (Exh. 2, p. 2). "Although he cannot vocalize his wants and needs, he is able to lead an adult by the hand to an area of interest. This can present a problem when those around him cannot ascertain exactly what he is searching for. This can, in turn, lead to injurious and self-injurious behaviors...Currently [the Student] will occasionally use PECS to indicate a preferred item (such as popcorn), but it is unclear if this is an intentional or deliberate

Hearing Officer's Findings of Fact and Decision                                    4

Case No. 133972

_____

attempt at communication...He understands the concept of "no", but cannot indicate "yes" or "no" with a head nod." (Exh. 2, p. 3)

  The DOE submitted a Behavior Support Plan, dated June 4, 2010 (Exh. 6). The plan includes seven items among the "Preventative Strategies/Management Plan". Included among these items is: "[the Student's] occupational therapist will create a sensory program for [him]; [he] will wear a weighted vest for a period of 30 minutes with at least a 1 hour break before the next session; a brushing schedule and movement schedule (as needed) have been added to his day;" "if [the Student] begins to show signs of agitation or frustration (upon striking his head once), he will be redirected by implementing calming techniques such as patting him on the back or applying deep pressure to his shoulders....If the behavior continues, de-escalation techniques will be implemented to redirect [him] in a firm and reassuring tone of voice..." (Exh. 6, p. 2) An emergency physical intervention is included, which provides for a "seated cradle with leg wrap" or if necessary, a "[t]wo person seated hold with a leg wrap". (Exh. 6, p. 3)

  The DOE submitted an Educational Annual Progress Report, dated December 8, 2010 (Exh. 7), prepared by the Student's teacher at Francis of Paola Early Learning Center ("Paola"). The report indicates that the Student exhibited a decrease in self-injurious behaviors: "These behaviors used to occur 5-10 times per day and last from 15 minutes to 1 hour and 30 minutes. Recently, [the Student] will display self injurious behaviors 1-3 times per day and last from 1-5 minutes". (Exh 7, p. 1)

  Teresa Del Priore, the Principal of Paola testified for the DOE. Ms. Del Priore testified that they had had a behavior plan and a sensory diet in place for the Student "There was a corner of the room where it was cushioned. There was a mat and there were pillows so that he could go that area to calm down. He had a brushing program and he also had pressure – pressure vest..." (T. 32) "He was experiencing [self-abusive behaviors], but not as frequently and we really weren't seeing that much of them in school....Brushing was done three times a day at school and then the Parents are taught how to do that at home. The lotion was put on twice during the day with a massage to calm him." (T. 33) She testified that Applied Behavior Analysis ("ABA") was used in the classroom (T. 39).

Ms. Del Priore testified that the Student had not been ready for academic work; rather, they had been working with the Student on "requesting things, picture communication, identifying pictures, identifying his name if he saw it, not academic, like pre-math, pre-reading." (T. 42). She testified that when the Student was engaging in self-injurious behavior, he would be "redirected": "you would place your hands on his fists and put them down, bringing them to his side and say hands down" (T. 43)

Ms. Del Priore testified that the Student had made progress "At the end he was making eye contact. He would be smiling. He was following directions with the OT. He loved – like we all would love, he loved to get the lotion massage so that when he – when she walked in the room he would smile. He would go to her and that was a big progress that he – that he would go to her." (T. 62-63). She testified that after he received this treatment he would be able to attend to an activity. (T. 63) She testified that he benefits from a sensory diet. (T. 65)

Ms. Del Priore testified that when the Student wanted to get out of his char, he would be redirected – that the paraprofessional or another adult would put his hand on the Student's hand; that this was done instead of allowing the Student to get up and do something other than attending to his task. (T. 78)

**APPLICABLE STANDARDS**

Two purposes of the IDEA are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally *Forest Grove v. T.A.*, 129 S. Ct. 2484, 2491 [2009]; *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 [1982]). A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (*Rowley*, 458 U.S. at 206-07; *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally

inadequate under the IDEA (*A.C. v. Bd. of Educ.*, 553 F.3d 165, 172 [2d Cir. 2009]; *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 [2d Cir. 2003]; *Perricelli v. Carmel Cent. Sch. Dist.*, 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525-26 [2007]; *A.H. v. Dep't of Educ.*, 2010 WL 3242234, at *2 [2d Cir. Aug. 16, 2010]; *E.H. v. Bd. of Educ.*, 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008]; *Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (*Rowley*, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (*Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (*Walczak*, 142 F.3d at 132, quoting *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (*Rowley*, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; *Walczak*, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (*Cerra*, 427 F.3d at 195, quoting *Walczak*, 142 F.3d at 130 [citations omitted]; see *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL

465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (*Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 [2d Cir. 1997]; see *Rowley*, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see *Newington*, 546 F.3d at 114; *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 108 [2d Cir. 2007]; *Walczak*, 142 F.3d at 132; *E.G. v. City Sch. Dist. of NewRochelle*, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]). Also, a FAPE must be available to an eligible student "who needs special education and related services, even though the [student] has not failed or been retained in a course or grade, and is advancing from grade to grade" (34 C.F.R. § 300.101[c][1]; 8 NYCRR 200.4[c][5]).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs (34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; *Tarlowe v. Dep't of Educ.*, 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008]), establishes annual goals related to those needs (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (34 C.F.R. § 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Subsequent to its development, an IEP must be properly implemented (8 NYCRR 200.4[e][7]; Application of a Child with a Disability, Appeal No. 08-087).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (*Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 [1993]; *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 [1985]). In *Burlington*, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; *Gagliardo*, 489 F.3d at 111; Cerra, 427 F.3d at 192]). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148). The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see *M.P.G. v. New York City Dep't of Educ.*, 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

## **FINDINGS OF FACT AND DECISION**

The first issue to address is whether the DOE offered the Student a free appropriate public education for the 2011-2012 school year. At the outset, I note that the DOE issued a "Nickerson Letter", dated June 24, 2011, informing the Parents that the DOE was not able to identify an appropriate placement site for the Student and indicating that it was making efforts to provide a placement site as soon as possible. It further informed the Parents that they had the legal right to place the Student in an appropriate special education program in a New York State Education Department approved private day school at public expense (Exh. F).

I note further that the Nickerson Letter was dated four days after the date of the final notice of recommendation (dated June 20, 2011) for a special class in a specialized school at P077K@P178K (Exh. E). There is no explanation for the issuance of the Nickerson Letter, and I therefore find that the issuance of the Nickerson Letter by the DOE constitutes an admission that the program at P077K@P178K was inappropriate. Since there is no

___

evidence that they subsequently offered the Parents another placement, I find that they have failed to meet their burden of proof that they offered an appropriate placement for the 2011-2012 school year. I will therefore turn to the next inquiry: the appropriateness of the placement at the Rebecca School.

The Student is classified as having autism and is delayed in many realms. The IEP, dated May 27, 2011, indicates that his levels of knowledge and development are delayed. He is not fully independent and requires supervision in regard to his daily living skills. His intellectual functioning is delayed and he has communication delays, and is non-verbal. The IEP also indicates that the Student requires a highly structured and small educational program due to his cognitive and speech delays. It notes that the Student displays behavioral issues that required constant adult supervision. (Exh. A, pp 1-2).

The IEP includes eleven goals. Four of the goals are in occupational therapy and include a goal relating to fine motor and visual motor skills for school activities such as completing puzzles, grasping materials and scribbling; a goal relating to improving self help and adaptive skills for increased independence at school, such as initiating dressing and undressing; being able to zip and unzip and remaining actively engaged in directed tasks; a goal relating to strengthening and improving gross motor skills such as imitating gross motor movements of a group leader, pedaling a tricycle, catching a ball, negotiating a multistep climbing obstacle course, and engaging in reciprocal ball play; and a goal to improve attention and sensory skills such as remaining seated, being able to follow two step instructions, not chewing household or classroom items and not demonstrating sensory seeking behavior for 3 to 5 minutes. (Exh A, pp. 3 – 5)

The IEP includes two educational goals, including increasing his knowledge of basic concepts, such as exploring a novel object, persisting on simple cause and effect toys, pointing to simple pictures and objects, matching objects and following one step commands; and a goal relating to increasing play skills by remaining on task, demonstrating functional use of toys, completing puzzles, choosing between activities and playing, identifying body parts and pretending. (Exh. A, pp. 5-6)

The IEP also includes goals relating to attending and completing tasks and increasing his self help and adaptive daily living skills. (Exh. A, p. 6)

Hearing Officer's Findings of Fact and Decision                                    10

Case No. 133972

---

The IEP includes two social emotional goals, including a goal relating to improving and strengthening social/emotional skills by transitioning from one activity to another without upset, responding to his name, seeking attention appropriately, reciprocating and initiating greetings, taking turns when playing with peers and sharing with peers; and a goal to improve his ability to interact with peers and adults by following classroom routines, ceasing an activity, engaging in parallel play, sharing and taking turns and maintaining joint attention during a reciprocal game. (Exh. A, p. 7)

The IEP also includes a speech goal to increase receptive, expressive and language skills by using sign language, augmentative communication device or gesture. (Exh. A, pp. 7-8)

The IEP recommends a 6:1:1 program with speech and language therapy 3 times per week for thirty minutes and occupational therapy three times per week for thirty minutes. It also includes a full time crisis management paraprofessional and a twelve month school year (Exh. A, p. 8-9)

The Behavior Support Plan ("BSP"), dated and updated from September 2010 through January 2010 and prepared by AHRC Francis of Paola Early Learning Center, describes The Student's behavior at the time as self-injurious and aggressive. It hypothesizes that the self-injurious behaviors are to escape demands and sensory overload. Possible antecedents include noise level and redirection when engaging in off task behavior. It notes that his behaviors are of mild intensity and that he can be redirected within one to five minutes. Warning signs included making unintelligible vocalizations that indicate agitation and "scheming" by looking to either side of him before engaging in a target behavior. (Exh. 6, p. 1)

The BSP includes determining the most appropriate method of communication for the Student, creating a sensory program, being redirected by implementing calming techniques such as patting him on the back or applying deep pressure, using de-escalation techniques; and using verbal prompts such as "no biting". A seating cradle with leg wrap and a two person seated hold with a leg wrap are listed as emergency remedies. (Exh. 6, pp. 2-3)

Hearing Officer's Findings of Fact and Decision                                    11

Case No. 133972

_____

The Occupational Therapy Progress Report, dated December 7, 2010, indicates that the Student tends to perform self-injurious behavior such as hitting himself "for seeking a great deal of sensory input to avoid redirection from staffs (sic)" Sensory activities such as bouncing on the therapy ball, swinging on the therapy swings, massaging, and joint compression help to calm him down and improve his sensory processing. (Exh. 12, p. 1) It is noted that these sensory activities as well as playing with a sensory kit (different types of sensory toys) ready his sensory system for daily and academic activity. (Exh. 12, p. 2)

Tina McCourt, the Program Director of the Rebecca School, testified for the Parents. She testified that the Student is on a very intense sensory diet, which means that he gets sensory input all day long. He is on a brushing protocol every two hours, receives deep pressure and wears a weighted vest, 30 minutes on and 30 minutes off (T. 255 – 256). She noted that after he takes the weighted vest off, he has an increased ability to focus and attend (T. 257)

She testified that the Student receives occupational therapy three times 30 and speech therapy four times 30. (T. 273) She testified that the occupational therapist and the classroom staff are working on his fine motor skills (T. 266), and that the teachers provide him opportunities to choose between pictures, to initiate communication rather than just responding (T. 269-270) She testified that the speech therapist is building up his gestural communication and vocalization, and that the speech therapist and the classroom staff are working on combining sounds for more effective communication (T. 276)

She testified that the Student has made progress at Rebecca, including remaining in a regulated state for longer periods of time, using more vocalizations or more gestures to be able to communicate and focusing and attending for longer periods of time. He is also beginning to understand the concept of "first this" and "then that" He is responding better to pictures, responding more consistently to his name, and is beginning to notice his peers. She notes that there is a lot less self-injurious behavior and complete dysregulation (T. 253-255)

She testified that the other students in his class are between ages five and seven and are "emerging verbal": none speak in long, fluid sentences. The Student is "in the middle" regarding language skills. (T. 282-283)

Hearing Officer's Findings of Fact and Decision

12

Case No. 133972

She testified that when the Student becomes dysregulated, they first address his sensory system. They see if there is something happening in the environment that he can't process and see if giving him sensory input decreases the self-injurious behaviors. (T. 288-289) The staff uses a crisis prevention intervention, beginning with verbal communications such as "oh, slow down", "oh don't do that", etc. in a playful way. If that is unsuccessful, they use something like deep pressure on his arms (T. 306). She testified that the Rebecca School provides the Student with a one-to-one paraprofessional (T. 299) who has a teaching assistant certification from New York State (T. 300)

Yael Rubinstein, the Head Teacher in the Student's class, testified for the Parents. She testified that she has seen the Student progress mainly in anxiety and self-injurious behavior (T. 378) She attributes this progress to the implementation of a strict sensory diet which was developed by his occupational therapist and implemented by the classroom staff (T. 379-380) She testified that he is easily redirected when he does exhibit a self-injurious behavior, that if very frustrated he may engage in head banging, but stops after about ten seconds, and that he does not engage in other self-injurious behaviors (T. 385)

She testified that he works on fine motor skills by using a lot of sensory materials, which strengthen his fingers; and works or visual skills by working on identifying symbols and pictures of items. (T. 389). She testified that they are working with him on his self-problem solving and task initiation, such as pulling over a chair to reach something, and zipping. (T. 389-390) She testified that they are working on his ability to remain seated and that he can sit for up to two minutes during really motivating activities; which he could not do at the beginning of the year. They are working on simple one step instructions (T. 392). They are working on having him explore a novel object with minimal adult modeling and demonstrating functional use of toys by presenting him with a bunch of different toys and modeling different ways to use them (T. 396; 398-399); and working on pointing to simple picture objects (T. 397). They are working with him on increasing his self-help and adaptive daily living skills (T. 399- 402).

She testified that they are working on social emotional skills, including transitioning from one activity to another without upset by showing him pictures of where they are going and giving him a lot of verbal warnings. She testified that he has been "very good with it".

(T. 402-403) They are also working on having him respond to his name by stopping activity and looking at the person (T. 403), seeking attention appropriately, reciprocating and initiating greetings with peers and adults and sharing with peers during playtime. (T. 404-406) She testified that they are working on his receptive communication and that the expressive communication is primarily worked on by the speech therapist (T. 409)

She testified that he can remain regulated for up to ten minutes at a time, as opposed to two to three minutes in September. (T. 395)

The evidence indicates that the Rebecca School is addressing the child's needs as set forth in the IEP developed by the DOE. I find that the program at the Rebecca School is appropriate and meets the needs of the Student.

I now turn to the equitable issues in the case. The DOE argues that I should consider equitable factors that go against the Parents' claim for tuition reimbursement. In his closing argument, the attorney for the DOE argued that the Parents "were not cooperative" during the time that the Student was at the pre-school in that they allegedly did not attend several meeting. He further argued that there were a number of days that the Student missed school or came late and that it had a negative impact on his ability to take full advantage of the program at Paola. He argued that the Parents did not attend the parent training sessions. He argues that the Student missed eight out of 24 days of school in July 2011 at the Rebecca School.

These arguments do not support a finding that the Parents were uncooperative with the CSE. The evidence shows that the Parents submitted a letter to the DOE, dated June 13, 2011, indicating that they were giving notice that they would be placing the Student at the Rebecca School and seeking tuition reimbursement (Exh. D). The District responded by sending the Parents a final notice of recommendation, dated June 20, 2011 and soon thereafter, a Nickerson Letter, dated June 24, 2011. The program offered in the final notice of recommendation was at <u>P.077K@P178K</u>, which was the site objected to in the Parents' ten day letter (See Exh. D and E). As noted, previously, the sending of the Nickerson Letter was an admission by the DOE that the site offer was inappropriate. The DOE had the opportunity to recommend a different placement at any time, after providing the Parents with a Nickerson Letter, and they have not done so. Moreover, the evidence shows that the

Hearing Officer's Findings of Fact and Decision                    14

Case No. 133972

---

Parents cooperated with the CSE. The Mother testified that she has attended all meetings of the CSE and the CPSE (T. 463). The Mother also testified that she contacted every school on the list of approved schools provided by the DOE with the Nickerson Letter and was unable to find one that she felt was appropriate for the Student (T. 451 – 454). She testified that she would have placed him in an approved school if she had found one (T. 464). I find that there are no equitable factors that would prevent prospective payment of tuition in this case.

    I find that the equities favor the Parents in this case.

    The Parents are requesting prospective payment of the tuition in this case, rather than reimbursement, due to the financial inability to pay the tuition. I note that although the Parents are committed to making these payments, pursuant to contract (T. 472), the Mother testified that they signed the contact knowing that they could not afford the $94,750 tuition (T. 473). The Parents' 2010 tax return shows income of $93,667. There is no tax exempt interest listed and a total of $22 in taxable interest. Logic indicates that it is impossible for the Parents to pay $94,750 in tuition when their income is less than that amount and there is no indication of savings. Nor should they be required to front this amount to fulfill the DOE's obligation to provide the Student with an appropriate placement. Although the Parents refer to *Connors* to support the proposition for prospective and direct payment of tuition, I believe that there is ample support in the IDEA itself and in the Supreme Court's decision in *Burlington Sch. Comm. v. Mass. Dept. of Ed.* 471 U.S. 359 (1985). In *Burlington,* the Supreme Court noted that:

> "In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that "appropriate" relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school." 471 U.S. 359, 370.

    In the instant case, the Parents are not asking to have the DOE place the child in a private school, but to make payments pursuant to a contract already entered into by the Parents with the private school. I see no logical difference between the two. If the DOE were to fail to make prospective payments to the Rebecca School, the Rebecca School would be within its rights to demand payment from the Parents or require that the child be

Hearing Officer's Findings of Fact and Decision                    15

Case No. 133972

---

removed from the school. The DOE is required by law to provide an appropriate education to the child, and so must ensure that the child's placement continues at the Rebecca School by paying the school's tuition.

The contract with the Rebecca School provides for tuition of $94,750. (Exh. G-5). The Parents have submitted proof of payment of $500 by money order dated July 5, 2011 (Exh. J). The contact with the Rebecca School indicates that additional payments from the Parents have come due.

I THEREFORE ORDER THAT the DOE shall pay the tuition at the Rebecca School for the 2011-2012 school year. The DOE shall reimburse the Parents for the $500 paid to the Rebecca school by money order dated July 5, 2011. In addition, the DOE shall reimburse the Parents for any additional amounts paid by the Parents to the Rebecca School. After deducting these amounts, the DOE shall pay the balance of the $94,750 tuition directly to the Rebecca School

Date: December 20, 2011

Diane Cohen, Esq

DIANE COHEN, ESQ
Impartial Hearing Officer

DC:gc

Hearing Officer's Findings of Fact and Decision                                    16

Case No. 133972

---

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                              17

Case No. 133972

---

DOCUMENTATION ENTERED INTO RECORD ON OCTOBER 31, 2011

| Parents' Exhibits | Date of Exhibit | No. of Pages |
|---|---|---|
| A. IEP | 5/27/11 | 12 |
| B. Hearing Request | 7/5/11 | 7 |
| C. DOE Response | 7/18/11 | 5 |
| D. Letter from Parents to CSE | 6/13/11 | 1 |
| E. FNR | 6/20/11 | 1 |
| F. P-1 Nickerson Letter | 6/24/11 | 1 |
| G. Contract with Rebecca School | 7/7/11 | 6 |
| H. Information about Rebecca School | Undated | 13 |
| I. Affidavit and attendance | 10/24/11 | 3 |
| J. Proof of payment | 7/5/11 | 1 |
| K. 2010 Tax Return | Undated | 1[1] |

| District Exhibits | Date of Exhibit | No. of Pages |
|---|---|---|
| 1. IEP | 5/27/11 | 16 |
| 2. Educational Progress Report | 1/28/11 | 12 |
| 3. Preschool Evaluation Scale | 5/6/11 | 4 |
| 4. Preschool Teacher Interview and Classroom Observation | 5/6/11 | 9 |
| 5. Speech and Language Annual Review | 12/16/10 | 3 |
| 6. Behavior Support Plan | 6/4/10 | 3 |
| 7. Educational Annual Progress Report | 12/8/10 | 3 |
| 8. Psychological Evaluation | 11/10/08 | 4 |
| 9. Social History | 11/10/08 | 3 |
| 10. Child Outcomes Summary Form | 2/6/09 | 11 |
| 11. Speech-Language Evaluation | 11/10/08 | 3 |
| 12. Occupational Therapy Progress Report | 12/7/10 | 2 |
| 13. IEP | 2/10/11 | 17 |

---

[1] Remaining pages, including dated page, added on subsequent hearing date

Hearing Officer's Findings of Fact and Decision                              18

Case No. 133972

---

## DOCUMENTATION ENTERED INTO RECORD ON NOVEMBER 30, 2011

| Parents' Exhibits | Date of Exhibit | No. of Pages |
|---|---|---|
| $K^2$. 2010 Tax Return | 3/1/11 | 16 |

## DOCUMENTATION ENTERED INTO RECORD ON DECEMBER 5, 2011

| Parents' Exhibits | Date of Exhibit | No. of Pages |
|---|---|---|
| L. Photographs of Student | January 2011[3] | 8 |

---

[2] Additional pages added to this exhibit, which was originally submitted with only the first page on the first hearing date

[3] As per testimony of Mother

# EXHIBIT C

# EXHIBIT C



**Department of Education**

# REDACTED



**BROOKLYN, NY 11233**

**P1-R**

Name of Child:
Date of Birth:
NYC Student ID No:
Date:               6/24/2011

Dear Parent:

Your child has been referred for special education services. At this time, the New York City Department of Education (DOE) is not able to identify an appropriate placement site for your child. The DOE is making efforts to provide a placement site for your child as soon as possible. However, you now have the legal right to place your child in an appropriate special education program in a New York State Education Department (SED) approved private day school. All tuition and transportation charges will be paid by the DOE and the SED if the placement is appropriate, and there will be no cost to you. If you decide to look for an appropriate private day school placement for your child, the DOE would be pleased to help you. Please note that this letter may not be invoked for enrollment in a residential program. A list of SED approved private schools is attached.

If you are interested in an approved private school, you should bring a copy of your child's current IEP to any approved private school you wish to consider. Please note that you may still enroll your child in an approved private school without an IEP.

The DOE will continue to make every effort to find an appropriate public special education program for your child as quickly as possible. When an appropriate public school site is found, we will contact you and send you a final notice of recommendation with the placement site being offered.

If you need help in choosing an appropriate private school for your child or need a copy of your child's most recent IEP, please contact (718) 758-7718.

# EXHIBIT D

# EXHIBIT D





























